

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00205-CV

IN THE INTEREST OF P.M., THE
CHILD

----------

### FROM THE 362ND DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. 2011-40896-362

----------

## MEMORANDUM OPINION ON REHEARING[1]

----------

### I. Introduction

Appellant Mother filed a motion for rehearing of our November 20, 2014 memorandum opinion and judgment, raising two substantive issues and seeking some factual corrections. We deny the motion in part on its substantive issues but grant the motion in part to clarify the factual issues raised by Mother,

---

[1]*See* Tex. R. App. P. 47.4.

withdrawing our prior opinion and substituting the following in its place. Our memorandum opinion otherwise remains unchanged. *See* Tex. R. App. P. 49.3.

This is the second appeal involving the termination of Appellant Mother's parental rights to P.M.[2] *See In re P.L.G.M.*, No. 02-13-00181-CV, 2013 WL 5967037, at *1 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (mem. op.). In the first appeal, the trial court terminated Mother's parental rights to P.M. after a bench trial, finding that Mother had endangered P.M. and that termination of her parental rights would be in P.M.'s best interest. *Id.* at *1, *3 n.6.; *see* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (West 2014). On November 7, 2013, we reversed the trial court's judgment and remanded the case for a jury trial when, based on the entire record, there was no showing that Mother's motion to reinstate the jury trial she had originally requested would unduly interfere with the trial court's docket, delay the trial, or injure the opposing party; thus, the trial court's refusal to grant the jury trial was not harmless in light of the case's material fact issues. *P.L.G.M.*, 2013 WL 5967037, at *4–5.

In nine issues, Mother now appeals the trial court's judgment on the jury's verdict that terminated her parental rights to P.M., arguing that the evidence is legally and factually insufficient to support the judgment's endangerment and

---

[2]We use initials for the child's name and pseudonyms for the names of other individuals who were involved in the case but who were not medical or mental health professionals, employees of the Department of Family and Protective Services (DFPS), or social services volunteers. *See* Tex. R. App. P. 9.8.

best interest findings and raising various due-process complaints, including that the trial judge should have been recused and that he demonstrated bias against her throughout the trial. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2). We affirm.

## II. Procedural Background

As we stated in the first appeal,

> [i]n February 2011, Father's assault on Mother put her in the hospital. DFPS closed its investigation after the caseworker found that the "risk factors" were controlled—Father had been incarcerated,[] and Mother no longer tested positive for drugs. Several months later, in October 2011, Denton County Child Protective Services (CPS) received a referral alleging that Mother had been using methamphetamine. Mother signed an acknowledgment that she had used methamphetamine on October 6, 2011.[3] CPS removed P.[M.] from Mother and placed the child first with Father's mother and then with a foster family.

---

[3]Mother was indicted for endangering a child by

intentionally, knowingly, recklessly, or with criminal negligence, engag[ing] in conduct, by omission, that placed [P.M.], a child younger than 15 years of age, in imminent danger of death, bodily injury, or physical or mental impairment, by failing to protect the child from exposure to the controlled substance, methamphetamine, and the defendant had a legal duty to act, namely, as a parent or legal guardian or having care, custody, or control of a child under age of 15.

Mother pleaded guilty to the lesser-included offense of assault under penal code section 22.041, entitled, "Abandoning or Endangering Child," a class A misdemeanor, in exchange for eighteen months of deferred adjudication community supervision. See Tex. Penal Code Ann. § 22.041 (West 2011). At the time of the 2014 jury trial, Mother had one more week of community supervision to complete.

3

On November 3, 2011, DFPS filed its original petition in this case. Mother filed her answer and jury demand on November 23, 2011, and the case was originally set for a jury trial on March 18, 2013.

On December 14, 2011, the trial court issued temporary orders and set out all of the services Mother would be required to complete over the course of the case: weekly counseling sessions; parenting classes; a "Choosing Healthy Relationships" class; a drug and alcohol assessment; and random drug tests (saliva, urine, and hair follicle). It also set out the requirements she had to meet over the course of the case: establish and maintain safe, stable, and appropriate housing and suitable employment for at least six months and through the pendency of the suit; refrain from engaging in criminal activities and from unsupervised contact with a child under age sixteen; comply with each requirement set out in the service plan or any amended service plan; have one hour of supervised visitation per week at the CPS office; and pay $25 each month in medical support.

. . . .

Between November 23, 2011, and the child's return to Mother on November 18, 2012, Mother completed all but the services that had been continued and extended by CPS such as counseling. At that time, all concerned parties—DFPS, CPS, the court-appointed special advocate (CASA) volunteer, the child's ad litem attorney, and Mother—agreed that P.[M.] should be returned to Mother.

. . . .

On March 7, 2013, the trial court held a permanency hearing and hearing on DFPS's emergency motion to modify temporary orders, in which DFPS again sought to remove P.[M.] from Mother. The CPS supervisor testified that DFPS had recently become aware of Mother's phone contact with Father after he had been bench-warranted back to Denton County for the termination trial, that their phone conversations had raised safety concerns, and that removing P.[M.] again was in the child's best interest. The CASA volunteer also testified that removing P.[M.] from Mother was in the child's best interest.

At the March 7, 2013 hearing, Mother's counsel asked DFPS's attorney if it was clearly seeking to terminate Mother's parental rights because "that wasn't what you were seeking before," and she asked for updated discovery. On March 8, 2013, the trial court entered an injunction prohibiting Mother from any contact with Father and from allowing any contact between Father and P.[M.], among other things, but it did not order the child's removal. The trial court stated that it would postpone making a ruling until the next day at docket call.

Three days after the trial court entered the injunction, Mother, who had been raised in the foster system herself, told a friend that DFPS was seeking to terminate both Father's rights and her rights to P.[M.] and asked whether she would be willing to adopt P.[M.] The friend indicated that her niece might be interested in adopting the child and arranged a meeting in conjunction with a family dinner. Without first seeking permission from CPS, . . . the child spent the night with the friend's family. There are no allegations that anything untoward happened to the child or with the family in question. Mother picked the child up the next day.

Mother's attorney filed a withdrawal of jury demand at 1:01 p.m. on March 15, 2013, the Friday before the originally scheduled jury trial. At some point that same day, Mother's friend contacted CPS to ask about P.[M.]'s placement, and at 3:50 p.m., the friend's niece filed a petition in intervention in the termination case, seeking to adopt P.[M.] CPS filed an application for a subpoena for Mother's friend at 4:09 p.m. and removed P.[M.] from Mother's home at 6:12 p.m.

*P.L.G.M.*, 2013 WL 5967037, at *1–2 (footnote omitted). The bench trial concluded over thirty days after Mother sought to revoke the waiver of her jury trial. *Id.* at *3.

At the conclusion of the bench trial, the trial judge made some findings on the record:

I'm going to find that the mother's testimony in many instances is not credible. I think that she's told so many lies that she can't even remember all the lies.

5

She lied about using meth or being under the influence of meth while she was caring for her child. She made up a story about someone giving the child a methamphetamine-laced bologna sandwich.

She had money put on the father's books, then came in court and tried to cover it up and lied about it.

She desperately tried to get the father to contact her and then made up stories about justifying it with closure and those type things.

I think very telling is the letters to the father and the phone calls. I think they're clearly indicative that she was planning to reunite with him upon his release from prison. Here are a few of the excerpts, and this is to a man who she testified beat her almost to death[:]

["]I think you are one of the greatest men I have ever met in my entire life.["]

["]I compare everyone to you, and they do not measure up.["]

["]I still love you. I am still in love with you.["]

And when we're talking about a relationship in the future, she states to him, ["]If you don't want that, then you need to let me know so I can go on. You need to tell me so then I can move away.["]

Those are clearly indicative of getting back together with the father in spite of the fact that he almost beat [her] to death and poses a danger to [her] and [her] daughter.

Then within the two weeks before trial, you go to your bail bondsman and ask her to adopt your child. You get your daughter involved by leaving your daughter with her, eventually spending the night with a family she just met. In fact you discussed this to the point in front of the child or with the child that the child would ask you, ["]If you die, is this the family I'll go with?["]

The bottom line is, you exposed your child to the culture of illegal narcotics, all the dangers that are involved with those criminals, and now you refuse to take responsibility for that.

In addition, you've put this child in danger by wanting to reunite with a violent man, then went through an elaborate deception throughout this case regarding the father by telling everybody that was trying to help you that you were scared to death of him, when in fact you were actually planning to reunite with him when he gets out.

You're putting your desires ahead of what's in the best interest of the child.

When they find out about all these, then you come back and try to say, ["N]o, I don't want to be with him.["]  But it's too little too late.

On May 9, 2013, the trial court concluded that Mother had endangered P.M. under family code section 161.001(D) and (E) and that termination of her parental rights would be in the child's best interest.[4]  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2).  For the reasons previously explained, we remanded the case to the trial court for a jury trial.

Two weeks after we remanded this case to the trial court for a jury trial, Mother filed a motion to recuse the trial judge, contending that his impartiality might reasonably be questioned in the new trial and that he had a personal bias or prejudice against her based on his findings at the bench trial's conclusion.  In December 2013, the regional presiding judge heard Mother's motion and denied it.

On January 13, 2014, Mother filed a motion to return the child to her.  She also filed a motion to enforce possession and access under the original

---

[4]The trial court also terminated Father's parental rights to P.M.  Father did not appeal.

7

temporary orders in effect before the child's return to her in the first case. On February 5, 2014, Mother filed an emergency motion for the child's return.

On February 26, 2014, the trial court held a hearing on Mother's emergency motion. Mother argued that her due-process rights had been violated when the child was removed from her in March 2013 and that because the termination order had been reversed and the case remanded for a jury trial, P.M. should have been returned to her or visitation should have resumed. DFPS responded that the March 2013 removal was not an original removal but rather a change of placement, which it had a right to do as P.M.'s managing conservator. The trial court denied Mother's motion but stated that it would be proper to have an evidentiary hearing to determine temporary orders until the jury trial and told the parties to set a hearing.

At the April 30, 2014 temporary-orders hearing, Mother testified that she had not seen P.M. in a year and that when she contacted CPS directly, she was told that "the attorneys were handing everything." After calling her CPS caseworker several times to no avail, Mother tried to go through her counsel and left all of her gifts for P.M. at P.M.'s ad litem attorney's office.

Mother testified that she had continuously asked to visit P.M., that she had not had any contact with Father since before the first trial and had a protective order against him, and that she thought P.M. might feel abandoned since Mother

8

was left in foster care for the last time at P.M.'s age.[5]  P.M.'s attorney ad litem asked Mother how visitation just a few weeks before trial would affect P.M. if Mother's rights were terminated again.  Mother replied, "I would have given anything to see my mother one more time."  P.M.'s attorney ad litem redirected Mother, stating "I'm not asking about you. . . .  Do you believe it would affect [P.M.] negatively at all to see you again after a year and gaining stability and then to lose rights?"  Mother replied, "Anything's possible."

DFPS's attorney asked Mother if whether, during her final two-hour visit with P.M. after the first termination trial, she had P.M. pose with a birthday cake and then take a photo each time after adding a candle.  Mother said that she had and that she thought they celebrated all the way up to P.M.'s eighteenth birthday to show P.M. that she was celebrating every year with her.   Mother said that she did not recall P.M. asking her to stop.

Norma Cruson, P.M.'s psychotherapist since April 2013, testified that P.M. had moved past her relationship issues with Mother over the last two months and had talked about wanting to be adopted.[6]  Some of P.M.'s relationship issues had involved Mother telling P.M. to lie to CPS and to tell Mother's boyfriend that P.M.

---

[5]Mother stated, "I have been that child.  I know exactly how she feels.  She feels abandoned, left alone, forgotten by her mother whom she hasn't seen in one year."

[6]Between November 2013 and January 2014, Cruson told CPS or P.M.'s ad litem attorney that visitation with Mother would be harmful to P.M. and not in the child's best interest because P.M. was still working through her issues.

was her sister instead of her daughter.[7] Cruson opined that receiving Mother's gifts would have confused P.M., and she expressed concern that seeing Mother might set P.M. back in her healing process. Cruson recommended waiting to see whether Mother's rights would be terminated at the upcoming trial before allowing visitation.

P.M.'s ad litem attorney informed the trial court that he had spoken with P.M. on the night before the hearing and said that P.M. missed and loved Mother and would like to see Mother for at least a short period of time.

At the hearing's conclusion, the trial court denied Mother's motion, stating that with the trial set for June 2, a visit would not be in the child's best interest if the jury decided to terminate Mother's parental rights.

On May 14, 2014, the trial court held a hearing on DFPS's motion to compel, in which DFPS complained that Mother's discovery responses were incomplete and that Mother had not supplemented her responses to DFPS's requests for disclosure since originally providing them on January 2, 2014, despite DFPS's agreement to extend the discovery deadline until May 9. The trial court stated that Mother would only be allowed to call and use testimony from any witnesses for whom she had "disclosed fully their name, contact

---

[7]Mother denied that she had ever told P.M. to pretend that she was Mother's sister when her boyfriend was around or that she had ever told P.M. to lie to CPS.

10

information, and a description of their opinions or expert testimony" by 5:00 p.m. that day. Mother's counsel replied, "Okay."

The jury trial lasted from June 2 to June 11, 2014, and involved testimony by many witnesses, including Mother, Father, P.M.'s paternal grandmother Sherry, CPS personnel, P.M.'s counselor in the first case, P.M.'s counselor after the first case, Mother's counselor in the first case, Mother's current counselor, a psychologist, the emergency room doctor who treated Mother in February 2011 after Father's assault, Mother's former bail bondsman Eileen, and P.M.'s current foster mother Katie. Cumulatively, the evidence showed domestic violence, drug use, and bad choices by Mother that occurred before P.M. was removed in November 2011 and after she was returned to Mother in November 2012 to March 2013, when DFPS removed the child again. The parties presented conflicting evidence on whether Mother suffered from memory loss and post traumatic stress disorder (PTSD) caused by Father's February 2011 assault.

Eleven out of twelve jurors found by clear and convincing evidence that Mother had endangered P.M. by knowingly placing or knowingly allowing her to remain in conditions or surroundings that endangered the child's physical or emotional well-being; that Mother had endangered P.M by engaging in conduct or knowingly placing the child with persons who engaged in conduct that endangered the child's physical or emotional well-being; and that termination of the parent-child relationship between Mother and P.M. was in P.M.'s best

11

interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2). This appeal followed.

### III. Termination of Parental Rights

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. *Id.* § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

### A. Sufficiency of the Evidence

In her sixth, seventh, and eighth issues, Mother contends that the evidence is legally and factually insufficient to support the termination of her parental rights under subsections (D) and (E) of section 161.001(1) and to support the best-interest finding under section 161.001(2).

#### 1. Standards of Review

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001, § 161.206(a) (West 2014); *E.N.C.*,

384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, DFPS must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.— Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that subsection (D) or (E) of section 161.001(1) was proven and that termination of parental rights was in the child's

13

best interest under section 161.001(2). *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated subsection (D) or (E) of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam.

14

Code Ann. § 161.001(1)(D), (E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

### 2.  Endangerment

In her sixth and seventh issues, Mother complains that DFPS's evidence failed to satisfy the clear and convincing standard of endangerment with regard to environment or conduct.

Endangerment is defined as exposing to loss or injury, to jeopardize.  *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also* Tex. Fam. Code Ann. § 161.001(1)(D), (E).   Under subsection (D), we must examine evidence related to the child's environment to determine if the environment was the source of endangerment to the child's physical or emotional well-being.  *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).  Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in her home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D).  *In re E.M.M., Jr.*, No. 02-12-00259-CV, 2012 WL 6632785, at *11 (Tex. App.—Fort Worth Dec. 21, 2012, no pet.) (mem. op.); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth

15

1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions but also to a parent's conduct in the home).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634. To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.— Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39, *and C.H.*, 89 S.W.3d at 26. To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533.

Because the evidence pertaining to family code subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that there was legally and factually sufficient evidence of both endangerment grounds).

16

### a. Memory Loss and PTSD

At the December 1, 2011 adversary hearing, when Mother received her service plan, Mother's counsel asked to be present when DFPS, CASA, or P.M.'s ad litem attorney was going to speak with Mother "due to the memory situation at this time," and Mother told DFPS that she received disability payments because of PTSD and memory loss. Mother testified at the hearing that she was given the diagnosis by a "disability person" but that she had not seen a doctor for the diagnosis; she had seen a nurse practitioner who was not a psychologist or psychiatrist.

Mother was told at the adversary hearing that she would be able to refer back to the written copy of her service plan. Jill Hoenig, P.M.'s CASA volunteer, testified that she became aware of Mother's memory loss and PTSD at the adversary hearing and said that Mother talked about it with her. Hoenig said that while Mother occasionally might not be able to remember something, she did not recall Mother's forgetting anything significant. Hoenig said that at no point did Mother ask her to write down any suggestions CASA had so that she could remember them better.

Dr. Lawrence Sloan, a psychologist, performed a consultative examination of Mother for the Department of Assistive and Rehabilitative Services with regard to Mother's June and July 2011 disability application. He diagnosed Mother with amnestic disorder due to head injury, meaning that she would have problems of

memory functioning, based on her self-report[8] and memory testing that showed some scores suggestive of memory impairment. He also diagnosed Mother with "acute stress disorder," which he testified "is essentially PTSD," and said that he had made an error by originally listing the diagnosis as acute stress disorder instead of PTSD.

Dr. Sloan testified that depending on the person, PTSD could interfere with the ability to think rationally. He also stated that people with PTSD could have memory loss manifesting as the inability to recall an important aspect of the trauma. Dr. Sloan stated that there were no overt indicators of malingering or symptom exaggeration based on Mother's apparent effort during the testing. However, Mother reported to Dr. Sloan that she took only Xanax—for her nerves in trying to raise teenage boys—and indicated that her last drug use was five years prior to her examination except for Father's having drugged her in connection with the February 2011 assault.

Mother exaggerated to Dr. Sloan how many times she went to counseling, telling him that she went multiple times a week; her counseling records reflect that she attended only eight times over the course of several months.[9] Mother

---

[8]Dr. Sloan said that the historical information in the report is almost entirely self-reported by the patient and if some items are factually inaccurate, that could skew the diagnosis, although that would also go to the self-report's veracity rather than the diagnosis itself.

[9]From April 2011 to September 2011, Mother attended eight counseling sessions.

18

told Dr. Sloan that she avoided being touched but did not disclose to him that she was in a dating relationship with Ted, who had been emotionally and physically abusive to her, at the time of the assessment.[10] Mother also told Dr. Sloan that she feared Father's release from prison but did not disclose that she had been visiting Father while he was in jail around the same time that the testing occurred. Dr. Sloan testified that all of this new information would call into question Mother's self-report.

Jennifer Livings, who counseled Mother from December 2011 to June 2013, testified that Mother had self-reported her memory loss and PTSD to her but that Livings had noticed some symptoms of PTSD on her own.[11] Livings said it would have caused her concern if she had known that Mother's psychological evaluation indicated that there was little memory loss because that was contrary to what Mother had told her.[12] Livings did not recall witnessing any memory loss when working with Mother.

---

[10]Denton Police Detective Scott Miller testified that shortly after Father's February 2011 assault on Mother, Mother contacted him with an assault complaint against her boyfriend Ted but subsequently asked Detective Miller not to pursue the charge.

[11]Livings testified that some of Mother's triggers were stressful situations in which Mother had to recall lots of information at once or that reminded Mother of past trauma.

[12]The trial court admitted Mother's March 12, 2012 psychological evaluation, in which Mother self-reported being on disability for PTSD and post-concussion syndrome. The evaluation stated that Mother "demonstrated little difficulty with her immediate, short-term, and long-term memory capacities."

CPS program director Teresa Morrow testified that at the June 2012 permanency conference, when the case goal was originally changed from reunification to termination, she had not felt that Mother had been making progress on her supportive outpatient treatment or participation in NA and AA because Mother had been unable to list the step of the AA program she was on, Mother's attitude that she did not need the services or programs, and CPS's ongoing concerns about Mother's progress on the domestic-violence issue. Morrow said that she was aware that Mother had stress issues but that she was not aware of a diagnosed disability.

Carol Hedtke, a nurse practitioner who had been seeing Mother since October 2013, had prescribed Xanax for Mother's anxiety and hydrocodone for pain. At her initial visit with Hedtke, Mother denied any memory loss, told Hedtke that she remembered everything about Father's assault, and told Hedtke about having panic attacks; Hedtke did not recall Mother's mentioning PTSD at the initial visit.

Mother did not tell Hedtke about her drug history although Hedtke said that it would have been important to know whether Mother had used methamphetamine. Mother testified that other than the overdose during Father's assault, she had not disclosed her methamphetamine use to Hedtke because she was ashamed of it. Mother told Hedtke that she participated in Al-Anon but not that she was a recovering addict.

20

Mother eventually told Hedtke that she suffered from PTSD, but Hedtke testified that she was unable to verify that diagnosis through any other medical records, although she agreed in her medical records with the diagnosis. Hedtke referred Mother to MHMR for PTSD. Hedtke also gave Mother a memory test in the office, and Mother scored twenty-five out of thirty, indicating mild to moderate memory loss. Hedtke testified that Mother's memory loss was consistent with and sometimes worse than someone of her age and circumstances and noted that there could be a correlation of PTSD and memory loss.

Dr. Jason West, the Denton Regional Medical Center trauma surgeon who treated Mother on February 17, 2011, testified that he noticed soft tissue swelling at Mother's scalp in a CT scan and stated that head trauma could lead to memory loss.

Jacqueline Fox, Mother's CPS caseworker during most of the case, testified that although Mother potentially had a PTSD diagnosis and had mentioned memory loss on several occasions, she had seen no outward signs of PTSD or memory loss. Instead, she said Mother was able to quote what Fox and other parties had said months before and to recite what had happened at specific hearings. Livings, however, said that Fox frequently contacted her for updates on how Mother was doing and asked her for tips on how to deal with Mother's PTSD.

Fox described Mother as very active, vocal, and quick to recall events in her case and to push for what she wanted. Fox said that Mother never asked her

21

for written instructions to help her remember and that no service providers told Fox that Mother needed written instructions or mentioned any disability hindering Mother's ability to complete her services; to the contrary, they provided Fox with Mother's service completion reports.

### b. Domestic Violence and Emotional Abuse

Although Mother testified that her relationship with Father—which had been on and off—"wasn't always bad," Sherry said that Mother and Father's relationship was bad and they "fussed and fought all the time." Mother stated that the only other time besides the February 2011 assault that Father had physically abused her was in 2006, when P.M. was three months old, but in her drug and alcohol assessment, Mother reported that she had endured physical and emotional abuse by Father from 2007 to 2011. Mother testified that she recalled only bits and pieces of the February 2011 assault and said that she did not recall telling Hedtke that she remembered everything.[13]

The trial court admitted Mother's February 3, 2014 application for a protective order, including Mother's affidavit, which presented a detailed account of the February 2011 assault, including how Father entered her trailer through the back bedroom window at around 2:30 a.m. on February 16, took P.M. to Mother's bedroom and told her to go to sleep and stay there, and then tied Mother to a chair with his belt. In the February 2014 affidavit, Mother stated that

---

[13]Detective Miller interviewed Mother after the assault and said that she was able to recall and recount what happened.

Father punched her like a punching bag, choked her, threw heavy decorative glass balls at her, threw Mother's countertop microwave oven on her, threatened to chop off her hands with a butcher knife, banged Mother's head against the stove hard enough to dent the stove, and hit Mother's head with a wrought iron chair. At one point, Father crushed all of the medication in the house and forced Mother to take it. Mother stated in her affidavit, "My daughter had come to my bedroom door at this point and witnessed this."[14] Mother claimed in her 2014 affidavit that she was in the hospital for three weeks, but Dr. West testified that Mother was in the hospital from February 17 to February 23.

Dr. West testified that Mother had to be intubated because the high level of sedatives in her system kept her from breathing for herself. Mother had multiple lacerations on her scalp and face; multiple bruises on her face, shoulders, arms, and chest; and had benzodiazepines—of which Xanax is one of the most common—and amphetamine or methamphetamine in her system. Mother had told EMS that someone made her swallow "benzos and speed." Dr. West was unable to specifically say how much medicine Mother had in her system, whether she took it willingly or someone made her take it, or exactly in what time frame she had received the doses within the previous eight to ten hours. Detective

_____

[14]Mother acknowledged that P.M. saw, at a minimum, the end of the assault; she also said that she learned during the assault that Father had choked one of her sons. In her 2014 psychological evaluation, P.M. recounted having seen Father attempt to drown Mother in the bathtub.

Miller testified that Mother was lucky to be alive. The trial court admitted photographs of Mother's injuries that were taken within a day of the attack.

Licensed professional counselor Emily Head saw P.M. from December 2011 to March 2013. When Head began the counseling, P.M. was around five years old. P.M.'s aggressive behavior displayed evidence of trauma—during one session in January 2012, P.M. pulled Head's nose and slapped her, placed her hand on Head's throat, and shoved her—and dissociation "to where she wouldn't talk about things in her home" or about Mother.[15] Head conducted play therapy and role playing in which Head would be the child and P.M. would be the mother. Head said that P.M. exhibited very controlling behavior during role-playing, telling Head what to do, how to do it, when to do it, when Head could talk, when Head could not talk, and how to draw, correcting Head "quite often." When Head observed P.M. with Mother at a January 2012 visit, P.M. was "stiff and nonaffectionate towards [Mother]," the opposite of how P.M. interacted with her foster mother, and Mother "was very high strung, talking and moving constantly."

Head said that P.M. started to open up a little more in 2012 and became calmer, less anxious, and engaged in more cooperative play; Head noted that

---

[15]Dr. Susan Talmage administered P.M.'s first psychological evaluation in December 2011 and noted that P.M.'s foster mother described P.M.'s social and emotional development as that of a two-year-old because P.M. needed constant attention, was bossy, and would cry incessantly if she did not get her way. When the foster mother made an innocuous suggestion about an art project, P.M. punched her in the face. P.M. would also sometimes make "angry animal noises that sound[] like growling."

24

P.M. thrived on structure and consistency.  Head also noticed that when P.M. did not have visits with Mother, she had less anxiety and she was less controlling in her play; in contrast, after a visit with Mother, P.M.'s play would become more aggressive and controlling.  Head said that P.M. would rarely speak about her biological family but that she frequently talked about her foster mother.  Head was concerned about P.M.'s inability or refusal to talk about Mother.

Head's counseling notes from June 2012 recorded more role-playing in which P.M. was the mother and Head was the child.  P.M. "in a harsh voice, asked [her], 'do you want to go to the parade?  You're not going!  You will not go if you don't do exactly what I do.'"[16]  This behavior continued for the entire session.  That month, Head suggested filial therapy to aid Mother and P.M. in rebuilding a trusting, healthy relationship because the visits between Mother and P.M. were very controlled by Mother.[17]  Head had noticed that as in P.M.'s role-playing, during Mother's visits with P.M., Mother would tell P.M. exactly what to

---

[16]In December 2010, when P.M. and Mother were living in Atlanta, P.M. rode in a Christmas parade as "Children's Queen of Atlanta."

[17]In August 2012, the CASA volunteer told Head that Mother had taken P.M. by the face and stated things like, "I am your Mom, don't let anyone tell you differently.  Do you understand me?" and "What is your name?"  When P.M. said "G.," Mother said, "No, your name is [P.L.G.M.]!", made P.M. repeat the full name several times, told her not to let anyone tell her that it's not "[L.]," and asked her again if she understood.  In September 2012, in more role-playing, P.M. commanded Head to do things in a certain way but then would say "never mind" and do it for her, at one point stating under her breath, "You can't do anything right, you are so stupid."  P.M. also made comments like "mommy knows how to do it" and "mommy is the artist, not [you]."

25

do, how to do it, when to do it, would correct P.M. often, and would take over activities and finish them herself. The first session of filial therapy did not occur until September 24, 2012.[18]

P.M. expressed to Head that she worried about Father trying to get out of jail because she wanted Mother and her foster mother to be safe. In November 2012, after the trial court approved a monitored return, P.M. told Head that she was very excited about going home to be with Mother and that her biggest worry was Father getting out of jail.

Fox stated that after P.M. was returned to Mother, Mother was very welcoming and would talk very openly, but P.M. appeared to shut down. Fox said that when she went to P.M.'s school to talk with her outside of the home environment and see how she was doing, P.M. did not want to see her and told her that she did not have to talk to her anymore.

After P.M. was removed from Mother the second time, she started seeing Cruson for counseling weekly from April 2013 until around mid-March or April

---

[18]Livings had recommended family therapy but Head recommended filial therapy instead because of P.M.'s age and developmental level. Filial therapy "is child-centered and revolves around the child, whereas family therapy is more of a talk therapy and teaching children and parents how to communicate effectively together." Livings had never met P.M. After Fox spoke with both counselors, CPS decided to follow Head's recommendation. When Mother and her attorney resisted, Fox brought Head and Livings together to figure out what was in the family's best interest. Once everyone agreed on filial therapy, Mother resisted the location of the therapy and wanted the therapy conducted at Livings's office, even though Livings would not be conducting the sessions. The sessions were ultimately held in Livings's building to accommodate Mother.

2014, when they modified the schedule to once every two or three weeks because P.M.'s therapy needs appeared to be tapering off. P.M. was six years old when Cruson started working with her.

Cruson said that P.M.'s first two play-therapy sessions were fairly intense, with aggressive, controlling behavior. When they role-played for several months with P.M. in the role of the mother and Cruson in the role of the daughter, P.M. was very controlling. Cruson described it as,

> And she would be in another room, and I wasn't supposed to come into the room. The door was locked. Not to bother her. I was given a task of cooking or go downstairs. And this progressed—it was very intense. And she would play out things.
>
> She would say things like, ["]If my boyfriend comes, don't tell him you're my daughter. You're my sister. If CPS is at the door, you're not to talk to them or you're to lie to CPS. If it's cops at the door, don't answer or you're not to talk to them or you're to lie to them.["]
>
> So that progressed. And she would even say he doesn't—a boyfriend, he doesn't like you. He doesn't like kids. He doesn't like you.[19] So she would play that out. And even at one point towards the end of all that play she had me—she said, ["]Just try to call the neighbors. They're not going to believe you.["] And she would pretend to be the neighbor. Just call. And so I would call. ["]And my daughter lies, you know.["]

Cruson said that in her "mother" role, P.M. also threatened to cut up her toys if she did not clean up, threatened to use a belt on her, and varied in mood

_____

[19]Mother did not disclose to DFPS that she was dating Roland during the monitored return period. Roland testified that Mother's CPS case began shortly after he met her in 2011, that he visited her three times a week when she was in jail, and that they began a dating relationship after Mother was released from jail in 2012 but were just friends at the time of the trial.

27

"from rude to sometimes sweet." Cruson noted in her counseling notes that P.M. expressed that while she sometimes missed Mother and had liked getting whatever she wanted, getting to stay up really late, and getting to eat whatever she wanted, she had felt scared and confused when Mother had "boyfriends" and did not want to live with Mother.

Cruson stated that domestic violence in the home, even when not directed at a child in the home, could make the child hypervigilant, give the child nightmares, and prevent the child from integrating her own experiences and from self-regulating her emotions.

### c. Drug Use

Mother used drugs during her relationship with Father[20] but stopped using methamphetamine during her pregnancy with P.M. and for six months after P.M.'s September 2006 birth. Mother's bail bondsman Eileen testified that Mother had told her that she and Father at times had not been good parents, including on an occasion when drugs were left out on the table.

---

[20]Father testified that he and Mother had had an on-and-off relationship for over ten years and that they used methamphetamine together "[a] couple times." Mother said that before 2011, she had used cocaine and methamphetamine with Father but did not recall how often. Mother, who had her oldest son when she was twenty-two years old (she was almost fifty at the time of the trial), admitted that she had used methamphetamine and cocaine when her two sons were not in her care during her relationship with Father and said that she had used cocaine five to seven years before the 2014 trial.

28

In October 2011, P.M. tested positive for methamphetamine,[21] and Mother signed an acknowledgment-of-substance-abuse form and told CPS investigator Tina Harris that she had been using drugs three to four times per week.[22] When Harris found Mother and P.M. in October 2011, P.M. appeared very disheveled and dirty, with extremely tangled and matted hair, and her skin "had a black tint . . . to it like she was very dirty." Harris testified that Mother also appeared very disheveled and was very erratic, unfocused, and belligerent.[23] Sherry testified that when she went to pick up P.M. after CPS called her, P.M. was filthy and had bruises and scratches all over, her hair was tangled, her clothes were filthy, and she had a strong odor. When Sherry bathed P.M. that night, Sherry noticed that the top of P.M.'s hair was gone. When Sherry asked P.M. about it, P.M. told her that Mother had cut it off because it had tangles and she could not comb it.

Harris testified that Mother told her that Erica and Mitch, who lived in Mother's trailer, supplied her with methamphetamine, and she blamed Father for planting Erica and Mitch in her trailer and for any drugs to which P.M. might have

---

[21]As we previously stated, Mother pleaded guilty to the lesser-included offense of assault under penal code section 22.041, entitled, "Abandoning or Endangering Child," based on P.M.'s positive drug test.

[22]Mother testified that Harris had exaggerated and that she had told Harris that she used methamphetamine two times a week.

[23]Sherry said that Mother was very unkempt that day, looked like she had lost ten or fifteen pounds in two or three weeks, talked rapidly, acted crazy, and was difficult to understand "because her voice was squeaking so bad."

been exposed. Mother denied having told Harris that she got methamphetamine from Erica and Mitch and said that she did not know whether Erica and Mitch were using drugs when she left P.M. with them for a couple of hours, even though she knew they had a history of drug use.

Harris testified that a parent who allows known drug users in the home endangers a child's physical or emotional well-being because drug users, especially those on methamphetamine, expose the child to the drugs, can be overly aggressive, tend to ignore the child, and may involve other crimes by those seeking to possess the drugs, including drive-by shootings. Harris stated that a parent who uses drugs while caring for a child endangers the child's physical or emotional well-being by having a difficult time meeting her own needs in addition to the child's basic needs for food, clothing, and shelter, as well as by having a difficult time staying on schedule and perceiving possible dangers to the child. Harris further stated that someone crashing from a methamphetamine high tends to sleep for "sometimes hours and days on end," rendering her unable to care for the child, and that children who are exposed to methamphetamine can have issues with brain development, behavior, and learning disabilities. In October 2011, P.M.'s developmental level was not on par with other five year olds—she was unable to list the alphabet and could not count.

Cheryl Culberson, First Step of Denton County Outreach's clinical director, testified that because a parent models behavior for her child, a parent's drug use could impede the child's ability to solve problems and to self-correct because a

drug user is impulsive and has diminished critical thinking skills. Further, when a parent is active in her addiction, the drug of choice comes first before the child, interfering with the parent's ability to meet the child's emotional needs. And a parent supervising a child while under the influence of methamphetamine would put that child in a high risk of danger.

Mother completed her drug and alcohol evaluation with First Step at the end of December 2011. In her evaluation, Mother characterized her drug problem as slight, denied that drug use kept her from working or caring for P.M., and stated that she had not used any drugs in the last thirty days. She also stated that she had consumed alcohol the day before her chemical-dependency evaluation. The intake clinician noted that Mother appeared guarded and minimized her drug usage "due to the fear of further consequences." She recommended that Mother enroll in supportive outpatient treatment, which consisted of twelve once-a-week group counseling sessions and four individual counseling sessions along with participation in AA, NA, and Celebrate Recovery, free community-based sobriety resources. In her March 12, 2012 psychological evaluation, Mother reported using methamphetamine around six months earlier (i.e., approximately October 2011) to "self-medicate" and that she had last used methamphetamine around four months before the evaluation, which would have put her last use in December 2011, around the time of her drug and alcohol evaluation.

Mother initially testified that she did not know how her methamphetamine use had affected P.M. other than destabilizing P.M.'s life by leading to P.M.'s original removal, but she subsequently admitted that it had affected her parenting and impaired her ability to care for the child.

### d. Mother's Choices

When Mother and Father started seeing each other and living together in 2002 or 2003, Mother sent her two sons—ages eight and twelve—to live with relatives. Until six or seven months into her relationship with Father, Mother did not notice that Father's behavior could become erratic when he drank alcohol— he would get angry and then start yelling. Father was diagnosed with bipolar disorder in 2004.[24]

In 2006, when P.M. was three months old, Mother left P.M. in bed while she went to fix a bottle for her. Father, who was intoxicated, rolled over and knocked the infant from the bed.[25] Mother nonetheless continued to leave P.M.

---

[24]In November 2011, Father denied to a CPS investigator that he had ever been diagnosed with any mental disorders but told her that Mother had been diagnosed with bipolar disorder, that Mother "has always done drugs as far as he knows[,] and that her main drugs are prescription that she abuses," specifically Xanax. In a letter from jail, Father told Harris that he had learned that Mother had been living with Ted and Debbie, that Debbie ran an unlicensed day care out of her mobile home, and that Mother and Ted were using and selling methamphetamine and Xanax from Debbie's home, putting children at risk.

[25]In an April 2010 affidavit in support of a protective order, Mother indicated that Father had been intoxicated on drugs, that he knocked P.M. off the bed, and that when Mother tried to get help, he kept her confined to the house and broke the phone so that she could not escape or call 911.

overnight and unsupervised with Father after that. Sherry said that during Mother's relationship with Father, Mother took Xanax all the time and would call the police to intervene in disagreements about Father having P.M.[26]

Mother acknowledged that she had known that Father had been in jail for six or eight months in 2008 for attacking Carmen, the mother of his son H.M.,[27] and she said that she had been afraid for her life when she applied for a protective order in Georgia in 2010 but then changed her mind. Despite the Georgia protective order, Mother continued to have contact with Father—initiating it herself at least once. A few weeks before he assaulted Mother in February 2011, Father threw a box cutter at the wall; it bounced off the wall and hit Mother in the leg. Mother agreed that a protective order does no good if the person it is supposed to protect initiates contact.

Mother's Georgia protective order expired a week or two before the February 2011 assault. Father said that Mother did not tell him that she had obtained a protective order against him and that he did not know he was not supposed to have contact with her.[28] He helped Mother by working on her car

---

[26]Mother denied a history of abusing prescription painkillers and did not see taking hydrocodone for her back or having an occasional glass of wine as an issue for AA.

[27]In April 2008, a court ordered Father to pay Mother $411 per month in child support for P.M. beginning on the first day of the second month "following release from prison."

[28]Although Mother contends on rehearing that the Georgia protective order stated on its face that Father received notice, this exhibit was admitted into

33

and house and said that they were in a relationship with frequent contact in January and February 2011. Father said that in his ten-year relationship with Mother, prior to his incarceration in February 2011, the longest period of time that he and Mother had gone without speaking or seeing each other was "perhaps a month." From March 2011 to at least June 2011, Mother visited Father while he was in jail. Mother's April 2011 counseling notes indicated that she wanted to help Father find treatment and that she was not interested in putting him in jail.

In October 2011, Mother and P.M. stayed with Mother's boyfriend Ted and his mother Debbie because the electricity had been shut off to Mother's trailer.[29] P.M. told Harris that Ted scared her when he yelled and screamed at Mother and called her names. When P.M. stayed with Sherry during a four-week safety placement, P.M. told Sherry that she did not want Ted blowing smoke in her face and begged Sherry not to send her home because Ted would tell her to take a walk and eat dog poop. P.M. also told Sherry that she was not afraid to stay home alone and knew how to fix a peanut butter sandwich for herself when she got hungry.

---

evidence at the 2013 bench trial, not the 2014 jury trial, and therefore was not considered by the jury in evaluating the evidence.

[29]Harris testified that when Mother opened the refrigerator in her trailer for a bottle of water during Harris's October 2011 investigation, an "awful stench of rotting meat and milk" emerged, and Mother said that she would need to pay around $500 to get the electricity turned back on. Mother was unemployed, and although Harris asked her several times about how Mother paid bills, she was unable to get an answer from Mother.

Mother's relationship with Ted ended in November 2011, and in February 2012, Mother filed an application for a protective order against him. In the affidavit sponsoring her application for protective order, Mother stated that Ted had been violent throughout their relationship, pushing her, punching her, threatening her with a gun and other weapons, choking her, and confining her against her will.

Around a month after P.M. was placed with Sherry, Sherry told DFPS that she could no longer keep P.M. because of Mother's volatile, confrontational behavior and P.M.'s aggressive and violent behavior towards her half-brother H.M. Harris testified that Mother's home was not a viable alternative to foster care because of Mother's behavior—she was aggressive, belligerent, erratic, irate, and unfocused, which was consistent with continued drug use —and she still had no electricity, was unable to pay her trailer's electric bill, and was staying with Debbie and elsewhere. DFPS decided to legally remove P.M. from Mother and place P.M. into foster care for the child's safety and welfare.

In an April 2012 progress report, a First Step counselor noted that Mother did not see the importance of abstaining from alcohol in her recovery process; Mother still did not see the importance of abstaining from alcohol at the time of the second termination trial. Mother testified that she could take hydrocodone for her back and "the fact that I have a glass of wine, I'm not an alcoholic." Mother said that she was sober from methamphetamine, cocaine, heroin, marijuana "or anything like that" and that she was no longer an addict. In contrast, Culberson

35

testified that "recovery is about total abstinence," and said that she would not consider a former drug user who engaged in social drinking to be sober. Culberson also testified that former drug users should ask their doctors for nonnarcotic medication and try to use alternative pain management methods because to do otherwise would place them at high risk for relapse. And she opined that it is dishonest regardless of guilt and shame for a drug addict to fail to disclose the extent of her drug history, as Mother had done with Hedtke.

Mother delayed the start of filial therapy, but once it finally started, everyone noted a huge positive change in the interaction between Mother and P.M., leading to the child's monitored return to Mother. P.M. transitioned back to Mother's home over the course of a month and was home with Mother before Christmas. Hoenig stated that it seemed like Mother was on the right track until around December 2012, when Mother started talking about wanting P.M. to have a relationship with Father. Hoenig testified that this concerned her because of Father's violent past.

In January 2013, Mother started sending letters to Father in jail. The trial court admitted seven letters that Mother sent to Father in January 2013 and two letters Father sent to Mother during the same time period. Mother told CPS that she had received a letter from Father and that it made her fearful, but she would not show the letter to her caseworker. Mother recalled telling Fox and Hoenig that she feared for her life when she received one of Father's letters. Mother nonetheless continued to reach out to communicate with Father.

36

In a six-page, undated letter, Mother told Father that to nine people, "including the D.A., CPS, [P.M.'s] attorneys who favor[ed] her," she appeared insane to want to help him remain in contact with P.M. Mother credited Father's only having received three years' confinement in his plea bargain with her decision to tell the district attorney that she wanted him to have two years of treatment instead of the twelve years the State was seeking. Mother told Father that P.M. saw too much of the assault and it came out in her counseling and that if he went to trial, his parental rights would be terminated. She informed him that if he signed DFPS's offer, then later, as long as he stayed clean, and "when these people are not involved in all of our lives," they could change the order to visitation as long as she and P.M. would be safe. Mother also chastised Father for not having responded and warned him that eventually she would stop trying and would move on. She concluded the letter with, "Come out of there and stay clean and be the man I know you can be, because that man is a great man. . . ."

In a two-page letter dated January 10, 2013, Mother told Father that she was working on an appeal for visitation for her and P.M., so if he wanted to see them, he needed to put them on his visitation list. Mother gave Father her phone number. In a three-page letter also dated January 10, 2013, Mother said that she had just gone to the mailbox to send her letter and found his letter and that she had given her address to Sherry for him two months before (i.e., around the same time that the trial court granted the monitored return). In her second

January 10, 2013 letter, Mother told Father that she was sending his parole board a letter to help him with early release on parole.[30]

Father replied in a letter dated January 16, 2013, telling Mother that she needed to take responsibility for her part in everything that had happened and that he just wanted her to give his letters to P.M., stop her visitation appeal, and focus on something else because he did not want to see her.

In a thirteen-page letter dated January 23, 2013, Mother told Father that she and P.M. read his cards together, that P.M. was devoted to her and Father, and that Mother's thoughts were filled with questions about what the future held for the three of them and whether there was any hope. Mother also stated in the letter that Erica had watched P.M. for an hour and that Erica and Mitch had put methamphetamine in a bologna sandwich.[31] Mother concluded the letter by stating, "I loved you and love you still, you always were the man that I loved with all of my heart. . . . You were and are my soul mate."

---

[30]Fox stated that at some point Mother talked about writing to the parole board for Father to get an early release. Fox said this was a huge change "[b]ecause for the 16 months prior to this point in the case, all that [Fox] had heard in reports and from [Mother's] verbal conversations was how fearful she was of [Father]." Father, however, at some point was under the impression that Mother had not tried to help him obtain early parole, because in one of his letters, he wrote, "[T]hanks for contesting my parole—your [sic] a real peach!" In the same letter, he listed personal property that he wanted returned and told Mother to bag them up and drop them outside Sherry's house.

[31]Mother testified that she did not know how P.M. had tested positive for methamphetamine but said possibly by ingesting a sandwich that Erica and Mitch had laced with methamphetamine.

In an eight-page letter dated January 25, 2013, Mother stated that P.M. was too informative but was learning to not give out so much information. Mother informed Father that she might get P.M. a puppy but it would cost an extra $200 and money had been tight. Mother closed her letter with, "We love you, [Father], we have missed you very much. []Know this, . . . believe this . . . try to begin to Forgive . . . so that we can go Forward."

In a letter dated February 1, 2013, Father asked Mother if she was "promoting" the court to terminate his parental rights. Father also told Mother that as much as he would like to see P.M., "this is a prison [Mother], it is an ugly, vile, violent, disgusting place and [he did] not want to expose [P.M.] to this putrid environment." Father also told Mother that he did not harbor any resentment towards her, that she had nothing to fear from him, and that he just wanted to get on with his life, put the experience behind them, and be the best father to P.M. that he could.

In a seventeen-page letter dated February 20, 2013, Mother told Father that she had been incarcerated for twenty-nine days so she was confused as to why it took him a month to write back when all he had was time. Mother stated,

> My heart still loves you, my mind thinks of you all the time and I realize that I am still in love with you . . . that nothing has ever taken that away . . . . But everyone tells me that I'm crazy to think the way that I do, but tell me "who can change my heart" no one . . . but God, and as much as I have requested his help, I remain the same.

Mother told Father that she was against his parental rights being terminated and that she had made this clear to CPS, CASA, and P.M.'s ad litem attorney. Mother stated in her letter that after the beating, she turned to methamphetamine because she was "a zombie[,] no energy" and depressed because she had lost him and P.M. had lost him.

Mother told Father that after two months of deliberation, the prison system had decided to grant them visitation and that she wanted to come see him. Mother told Father that everything could be changed and "what we choose to do after my [CPS] case is closed is up to us." Mother stated,

> So, do you want to see me now? Do you want any of the things I think to have where you and I are concerned or do you still wish for me to focus my efforts elsewhere?

> I cannot live here in this City and you live here and have nothing to do with you[;] it would never work out that way and you know it. My love is to[o] great[;] it would destroy me to even begin to see you with another, and I[']m just being honest. So if this does not work out I will have to move away with [P.M.]

> The truth is [Father] if there is no love for you left for me then please tell me the truth that I can go away and you can live your life and I can go and live mine, and [P.M.] will always be in your life for she is always your daughter, just things would be different. But least I would know the truth. Please write me and tell me what you wish to happen.

> . . . .

> . . . . It would be a perfect world if we could raise [P.M.] together if you could stay clean and sober and I too would be and we could love one another as husband and wife but in truth we would have to move away from here because I could not risk CPS coming again from friends of your past and people who are hateful of us both[.] I want a new start, a new beginning. I don't want to live

40

here anymore. If this all sounds crazy to you and it is nothing that you want then please by all means tell me . . . it changes nothing in regards to your relationship with your daughter[;] it just allows me to grieve its loss and force me to move on. I cannot lie to myself and I care nothing about what others think. I only care about my daughter and hers and my futures.

Mother testified that she sent her address to Father via his mother so that he would respond and communicate with her about the CPS case and because she was trying to figure out "where he was at" as to their relationship. She petitioned the parole board to allow her and P.M. to visit Father in jail because she wanted closure and continued to write to Father after he asked her not to and after he told her not to try to visit him because she needed to know that he was not going to come after her out of anger.

Mother acknowledged that she wrote the letters when P.M. was with her on a monitored return, that DFPS was still the child's managing conservator at the time, and that she never asked DFPS for permission to take the child to jail to visit Father but claimed that DFPS never told her she would have to ask permission to do that. When DFPS's counsel asked Mother why she believed that it was in P.M.'s best interest to go to jail to see Father, Mother replied, "It was just a bad choice," and said that she did not know why she thought it was appropriate at the time.

Mother started calling Sherry, first about CPS's having mailed some forms to Father regarding his parental rights and then to tell Sherry, "You know you can visit [P.M.] anytime you want to. . . . You can pick her up and you can take her wherever you want to, but don't tell me where you're taking her." Sherry said that

she believed Mother meant that she could take P.M. to jail to see Father. Mother recalled leaving Sherry a voicemail in March 2013 stating that Sherry could take P.M. wherever she wanted and said that she had asked not to let her know where "[b]ecause it was less for [Mother] to concern [her]self with." Mother agreed that it would not have been in P.M.'s best interest for Sherry to take her wherever she wanted without telling Mother. Mother did not ask DFPS for permission to let Sherry take P.M. "because [she] didn't believe that [she] had to."

When Father was brought back to Denton County, Mother's friend Betty put money in his county jail account so that he could call Mother. Mother denied asking Betty to put money on Father's account although she told Father that she had asked Betty to do it and that she went with Betty to the jail to do it.[32]

Mother said that in seven phone conversations in February and March 2013, she and Father talked about P.M., about the case, about Mother trying to get Father to sign "the papers," about their past relationship, and about what their relationship would look like in the future.[33] With regard to one of the phone

---

[32]Betty also denied that Mother had asked her to put the money in Father's account. Betty did not know Father, had never spoken with him, and put the money on his account because Mother and Father had not had a chance to talk.

[33]The trial court admitted the recorded phone calls over Mother's objection and allowed publication to the jury. DFPS and CASA became aware of Mother's and P.M.'s phone contact with Father in early March 2013.

Fox described her reaction to the calls as very surprised and said that DFPS had concerns about the calls' contents because "the level of interaction,

conversations, when DFPS's counsel asked Mother if she thought it was appropriate to talk about drugs and living in hell with P.M. in front of her, Mother said, "No. I wouldn't do that today." Mother said the heat of the moment and her conversation with Father for the first time in two years made her do it. Mother said that she did not know how that affected P.M. but she was sure it made P.M. sad.

Mother did not recall telling Father in one of the phone conversations that she had been mad all week because he had taken so long to call her. Mother attributed her giggling in the phone calls to a nervous reaction and said that she "laughed pretty much through" the calls because of nerves and not because she was happy to talk to him.[34] Mother stated that the phone calls and letters were

intimate interaction, between the two of them was pretty surprising for somebody who was telling [Fox] as recently as a few weeks prior to hearing those calls that she was very fearful of this man." Mother's comments to Father about wanting to be with him and wanting a family concerned DFPS because Fox had recently talked with Mother about what her plans were to maintain her protectiveness when Father was released.

Hoenig said the letters between Mother and Father were surprising because Mother had conveyed her fear of Father and had at one point talked about possibly moving out of state when he was released from jail. Mother never told Hoenig that she was having conversations with Father and never asked Hoenig whether it would have been in P.M.'s best interest to have those phone calls.

[34]Livings gave the following description of Mother's responses when uncomfortable:

> Sometimes she loses her words. I think sometimes she confuses herself sometimes when she gets very flustered or stressed out. Also, traditional communication patterns that most

43

for closure and because she did not want Father to blame her for DFPS's terminating his parental rights. Mother said that because she could not get help from anyone else, she took it upon herself "to find out where he was at and if he would hold that against [her]."

DFPS then asked Mother why she told Father in the phone calls that she still loved him and that she would have a hard time seeing him with another woman. Mother said that she would not deny that she had loved Father and that she was being honest when she told him that it would be very difficult for her to see him with someone else but that she knew that she could not be around him. Mother said that she was trying to find out whether he really meant it when he said he did not want a relationship with her or if he was going to come back after her for the termination.

Mother said that she knew the major reason Father had called her was because he wanted to talk to P.M. When DFPS then stated, "And yet you made

---

people follow, sometimes defensiveness. But there's also other sides with very lighthearted behavior, a lot of laughter as well when she gets very anxious.

Livings said that she had listened to Mother's jail calls with Father and opined that Mother "was very inquisitive and hopeful to find out and assess [Father's] approach to her, what he—how he would respond to her, the things that he would say when they spoke on the phone that would help her assess what could happen if he were released from prison." Livings said that Mother's laughter on the calls could be very similar to her laughter when uncomfortable. Heather Ryan, Mother's counselor at Denton County Friends of the Family since January 2014, said that when Mother is nervous or feels emotionally vulnerable, she giggles to release tension.

44

it your darnedest effort to make it about you," Mother replied, "It would appear that way, yes." Father said that Mother was putting her own needs first when he called from jail and wanted to speak with P.M. but Mother would not pass her the phone.

Mother said that when she initiated contact with Father in February 2013, she did not want Father's rights terminated and wanted him to be able to have visitation with P.M. "[i]f he had corrected his life." Mother let P.M. talk with Father and said that she had not known that she needed DFPS's permission to do that because no one had given her anything in writing that stated P.M. could not talk to Father. Mother nonetheless acknowledged that the letters and phone calls were not a good idea.[35]

Mother read from the trial court's November 2, 2012 monitored return order, in which Mother was "prohibited from allowing any adult to remain overnight at her residence unless prior approval from the Department caseworker is received in writing." Mother said she did not recall whether she was told anything about DFPS's prior approval being required before allowing anyone unsupervised access to P.M. when the order was entered but that she had not received written instructions when P.M. was returned to her. The trial court then

---

[35]During cross-examination, Livings acknowledged that she had previously testified that she did not believe that Mother was being protective of P.M. when she sent letters to Father and spoke with him on the phone. Livings had not foreseen that Mother would communicate with Father and testified that she would not have recommended that Mother attempt to do so.

45

admitted a certified copy of the hearing on Mother's motion to return and monitor as Petitioner's Exhibit 67. That exhibit contains the following testimony by Mother:

> Q. Now, as far as [P.M.]'s development and what she needs and who she needs to be around, do you understand the limitations that the Department is keeping in place on people who supervise her or baby-sit her?
>
> A. I do.
>
> Q. And do you understand that there are to be no adults overnight in the household and nobody supervising her without prior approval of the Department.
>
> A. Yes, I understand.
>
> Q. And that includes any family members, friends, anybody else who you meet or may work with.
>
> A. Yes.

Mother claimed that she had forgotten about this, but she recalled that DFPS had had to approve Betty to travel with Mother and P.M. when they attended an out-of-state funeral.

When asked why, if Betty had to be approved by DFPS, Mother thought anyone else could be around P.M. without prior approval by DFPS, Mother replied,

> Because under my assumption, which evidently was wrong, I believed that my daughter was my daughter. I believed that I was to keep her safe, that I was to protect her, that she was to go to school, and that I was to be her mother like all mothers would be to their children, and pretty much that she was mine.

46

Mother said that she knew under "monitoring" that she would be watched closely to make sure that P.M. was safe and that if she did anything to put P.M.'s best interest in jeopardy, DFPS would remove the child from her. However, Mother also said that she did not think that the child would be removed from her when Mother let P.M. spend the night at someone's house without seeking prior DFPS approval.

Fox said that after learning of the phone calls, DFPS's view started to change with regard to whether P.M. should remain with Mother.[36] On March 7, 2013, Mother left Head a message about seeing P.M.[37] Head was fully booked that week and could not fit her in. On March 8, the trial court entered an injunction to prevent P.M. and Mother from having contact with Father, and Mother said that she had obeyed the injunction. On March 9, Mother sent Head a text to see if she could fit P.M. in soon because she was afraid P.M. might have heard something that might upset her.

Head was able to get P.M. in on March 11. Head noted,

> When they arrived[,] they were in the lobby having a snack from Chicken Express. [P.M.] appeared happy. Joking and smiling with her mom. [Mother] was talkative and did not relay too much information as to the current situation. It was all kind of in code to protect her daughter. She did say she was not sleeping, and that after making the "decision" her depression had lifted. In our previous

---

[36]DFPS changed its goal back to termination on March 6, 2013, after learning of the jail phone calls.

[37]Head did not see P.M. as much after P.M.'s return to Mother but had stayed in touch with Mother through phone and text.

47

talks in the lobby at [P.M.]'s appointments, [Mother] often expressed concerns regarding [Father]. She was fearful, but also wanted to forgive and show grace. She seemed to be battling with fear for her life and not denying [Father] or [P.M.] of a relationship.

During [P.M.]'s session[,] her biggest worry was going back to live with [her foster mother]. [Head] asked her what made her believe that was possible. She just gave [Head] an "I don't know." [P.M.] said she loves her mommy and wants to stay with her. [Head] also told [P.M.] that [she] heard [P.M.] got to speak with [Father] and how nice that must have been. [P.M.] told [Head] she was happy to talk to him. She stated that he said he would not be able to send cards or talk to her anymore and this made her sad. . . . [P.M.] did state that her mom was fighting in court for her.

Head reflected that it was possible that Mother had been coaching P.M., and she was concerned that P.M. was displaying codependent behavior with regard to her need to protect Mother. Head testified that it was not appropriate or in P.M.'s best interest to involve P.M. in the phone conversations between Mother and Father without checking with a counselor first because the conversations could have been detrimental to the child in light of P.M.'s fear of Father getting out of jail and being worried about her safety and Mother's safety.

On the evening of March 11, because Mother was concerned that P.M. would be returned to foster care, Mother sent P.M. to dinner with her bail bondsman Eileen and her family to meet Eileen's niece as a potential adoptive parent.[38] Eileen said that P.M. did not appear uncomfortable when Mother left

_____

[38]Eileen met P.M. when P.M. was returned to Mother in November 2012, and she saw P.M. four to six times when Mother was at her office to conduct bail bonds business until Mother's criminal case closed on December 10, 2012; those visits lasted no longer than an hour. Eileen said that during one of Mother's visits, Mother asked her if she and her husband would take care of P.M. if

48

her. P.M. and Eileen joined Eileen's son, his wife, his six children (ages two to fifteen), and Eileen's niece and her niece's husband at a restaurant. The children that were roughly P.M.'s age were female, and P.M. had a great time at dinner. After dinner, the niece and her husband took P.M. out by herself for ice cream to see how they would interact with each other. They were gone for around an hour and then came back, and Eileen took P.M. to play with the other girls at her son's house. Mother called twice that night—once before dinner and once at 10:00 p.m.

Eileen said that when her daughter-in-law suggested P.M.'s staying overnight because all of the girls were playing, Eileen agreed. However, upon reviewing her prior testimony, Eileen said that dinner was preplanned and that she had actually thought that she was taking P.M. overnight. Eileen said that Mother was fine with the idea of P.M. spending the night at Eileen's son's house. When Eileen picked up P.M. the next morning, she was in good condition and did not seem traumatized. Eileen said that she never gave CPS a thought because she did not know that CPS was still the child's managing conservator.

Mother later told Eileen that P.M. had asked her whether that was the family she was supposed to live with and that Mother said, "Yes." Eileen said that she and P.M. had talked on the way to dinner about whether P.M. would like

---

something should happen to Mother. Eileen also said that she and Mother had discussed this to different extents more than once; P.M. was present for one of these conversations but was wearing headphones.

to come to Eileen's house if something happened to Mother. P.M. told Eileen that she would be okay with living with her.

P.M.'s ad litem attorney asked Eileen, "If you met someone five times over the course of a year, do you just leave your child to spend the night with them overnight?" Eileen responded, "Possibly. It would depend on what I knew of that person and any contact I have. Now, [Mother] had a lot more contact with me outside of [P.M.] being there because I was her bail bondsman." Eileen said that she and Mother had considered scenarios in which Eileen and her husband would make sure P.M. was cared for if Mother were convicted or if Mother died and left P.M. an orphan.

Mother said that she had been asking Eileen to adopt P.M. for around a year and that she was trying to have P.M. visit people who might want to adopt her while still in the CPS case because she did not want P.M. in foster care. Mother said that she had panicked when DFPS's goal changed to termination, which was why she sent P.M. with Eileen. She told P.M. that if DFPS took P.M. away from her, she wanted her to go live with a good family instead of in foster care. Mother herself had only met two of the people that P.M. went to dinner with that night—Eileen and Eileen's son, who was the judge in Mother's criminal case—and she knew nothing else about Eileen's family. Mother said she did not think to ask Eileen whether Eileen was going to allow the niece and nephew to be alone with P.M.

50

Mother said that she did not think there was anything wrong with letting P.M. go unsupervised with someone who had not been approved by DFPS and spend the night.[39] The following dialogue between Mother and DFPS's counsel then ensued:

Q. Well, I asked you if there's a lot that's gone on in this case and that you've testified to that you apparently just didn't see a problem with.

A. I didn't believe there was anything wrong with it.

Q. Okay. You didn't see a problem in how meth affected your parenting.

A. I didn't say that.

Q. Okay. But you said you didn't see an effect at the time; it was only after the fact. Correct?

A. Correct.

Q. And you didn't really see a problem at the time of initiating contact with [Father] after the Georgia protective order, but after the fact. Right?

A. I see where you're going.

Q. Okay. Well, is that after the fact, is that correct, what you're saying?

A. Correct.

---

[39]Head testified that it was not appropriate for Mother to let P.M. stay overnight without approval because that could have created some instability or anxiety for P.M. And Head said that if P.M. was told that she would be adopted by that family if CPS took her away from Mother, this would have devastated the child, made her aggressive and anxious, and caused her to lose trust and have nightmares.

Q. So do you understand why the Department had concerns about your ability to make decisions in your child's best interest?

A. No.

Fox said that Mother's act of sending P.M. off unsupervised to meet a potential adoptive family and spend the night at someone else's home without notifying DFPS led to the decision to remove the child. When Fox learned of the event after the fact, she contacted her supervisor, who contacted their program director and the legal team, and the decision was made to remove P.M. out of concern for her safety and Mother's lack of protectiveness, a decision influenced by Mother's previous phone contacts with Father. Fox said that anything could have happened when Mother allowed P.M. to go out unsupervised and spend the night with people that DFPS had not approved.

Morrow concurred that although the jail calls were concerning, it was Mother's decision to let P.M. go with Eileen for dinner and an overnight visit without notifying DFPS or allowing them to run a background check on Eileen, along with Mother's talk about adoption with the child, that raised flags about stability and the bond between Mother and P.M. Morrow said that a parent who has a strong bond with her child would not seek out an adoptive home for the child and that she did not think it was a good idea for Mother or anyone else to groom the child for adoption. Morrow stated that she had been unaware of any relationship between Mother and Eileen but said that if she had known, she did

not think it would have changed her decision because it was still done without DFPS's approval.[40]

Morrow agreed that Mother had stayed drug-free during the CPS case but said that Mother had not necessarily worked on the "other part [, which] is to work on the issues why you're using in the first place to refrain from using and staying clean and sober for the rest of your life." Morrow also said that Mother was not forthcoming, open, and honest with DFPS during her case, and the things that she had failed to disclose—her communications with Father and allowing an adoption visit between P.M. and strangers—showed that Mother had not necessarily accepted responsibility for her behavior and why P.M. came into care. Morrow said that as a result, P.M. had experienced the emotional turmoil of being in foster care, returning home, returning to foster care, and possibly facing adoption. When asked whether it was Mother's relationship with Father that concerned DFPS or Mother's inability to see how that could endanger her and P.M. by engaging him in communication again, Veronica Tackett, Fox's CPS supervisor, replied, "It's more about her decision making and how she fails to realize that can endanger her child, as well as her."

---

[40]Mother sought to admit CPS's policy on removing a child from the home and evaluating the need for removal. The trial court sustained DFPS's and the ad litem attorney's objections to relevance. The trial court initially admitted CPS's policy in determining neglectful supervision despite DFPS's relevance objection, but after Morrow testified that this policy was not used to determine whether a child should be re-removed from a parent's home when DFPS had temporary managing conservatorship, the trial court changed its ruling and sustained DFPS's objection.

Cheri Fry, the CASA supervisor, testified that CASA was concerned, based on Mother's begging Father to have a relationship again after a year and a half of counseling, classes, and services, that if Mother retained her rights, she would allow Father to see P.M. in the future. Fry said that CASA was also concerned that Mother was a danger to P.M. because her decision-making skills appeared to be impulse-driven, which could put P.M.'s safety and well-being in jeopardy, citing as examples Mother's decisions to write letters and communicate with Father by phone and to allow P.M. to spend the night with people that Mother did not know.

Fry met with Father in March 2013 while he was incarcerated, both before and after he signed his affidavit relinquishing his parental rights to P.M. During one of those meetings, Father told her that he hoped Mother would get P.M. back because then he would still be able to be a part of P.M.'s life. Fry said that based on her conversation with Father around two weeks before the jury trial, Father appeared to believe that if Mother received custody of P.M., she would eventually allow Father to see P.M. despite the no-contact protective order.

Father testified that he had not communicated with Mother since his release from jail and that she had not communicated with him. He claimed that he did not recall telling CASA that Mother would let him see P.M. if she retained her rights to the child, said that he did not believe Mother would allow him to see P.M., and that he and Mother did not intend to pursue a relationship together.

54

### e. Analysis

Viewed in the light most favorable to the finding and the judgment, a factfinder could reasonably form a firm belief or conviction with regard to endangerment under both subsections (D) and (E), from the physically and emotionally abusive environment and conduct from which P.M. was removed initially to Mother's poor decisions during the monitored return that subjected P.M. to uncertainty, emotional danger, and the potential physical danger involved in sending a child out overnight with strangers. *See, e.g.*, *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (stating that evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices). And giving due deference to the jury's findings—particularly with regard to witness credibility—we conclude that a factfinder could reasonably conclude that Mother's purported memory loss and PTSD either did not exist or were insufficient to justify any of her endangering conduct or the endangering environment that she created for P.M. before or after either time the child was removed. *See, e.g.*, *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (stating that conduct that subjects a child to a life of uncertainty and instability endangers her physical and emotional well-being). Therefore, we conclude that the evidence is legally and factually sufficient with regard to both grounds of endangerment, and we overrule Mother's sixth and seventh issues.

55

### 3. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)  the desires of the child;

(B)  the emotional and physical needs of the child now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

(F)  the plans for the child by these individuals or by the agency seeking custody;

(G)  the stability of the home or proposed placement;

(H)  the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)  any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

In her eighth issue, Mother argues that the evidence was insufficient to show termination was in P.M.'s best interest.[41]

_____

[41]Mother also argues that the denial of access and visitation "has so significantly impaired the ability to present current evidence on the parent-child relationship that it is nearly impossible to adequately determine best interest of the child to a clear and convincing level of proof." We disagree. We reversed the trial court's original judgment so that Mother could have her disputed fact issues resolved by a jury, not so that Mother could redo the original CPS case in which she had already completed her service plan. And Mother could have filed a petition for writ of mandamus seeking to vacate any of the trial court's orders pertaining to access and visitation pending the new trial but failed to do so. *Cf. In re Stearns*, No. 02-14-00079-CV, 2014 WL 1510059, at *2 (Tex. App.—Fort Worth Apr. 17, 2014, orig. proceeding [mand. denied]) (mem. op.) (noting that in custody cases, courts often grant mandamus relief because appeals are frequently inadequate to protect the rights of parents and children and stating that "[t]he further delay of a new trial and appeal and the related potential emotional hardship on the child are enough for this court to conclude that an appeal would not be an adequate remedy in this case"); *In re Allen*, 359 S.W.3d 284, 288, 291 (Tex. App.—Texarkana 2012, orig. proceeding) (op. on reh'g) (reviewing temporary orders in termination-of-parental-rights case and granting conditional relief to return child to mother); *In re J.W.L.*, 291 S.W.3d 79, 83 (Tex. App.—Fort Worth 2009, orig. proceeding [mand. denied]) (stating that because

While no one disputes that Mother completed her required services—one of the reasons DFPS recommended the monitored return to the trial court—in addition to all of the evidence set out above in our sufficiency review of the endangerment findings, the jurors heard testimony that P.M. wanted to be adopted by her foster family, heard about Mother's behavior at her last visit with P.M. after the removal, and judged the credibility of Mother, her witnesses, and DFPS's witnesses in making their best-interest determination.

P.M.'s ad litem attorney asked Mother about the last time she saw P.M., and Mother testified about the same event that the parties discussed at the April 30, 2014 temporary orders hearing, when she threw a "celebrate life" party, putting pictures of Mother and P.M. on the wall and bringing cake and balloons "and everything you would want to give your child" that Mother could fit in the room. Mother said that because she wanted to celebrate the birthdays that she might not get to have with P.M., she sang "Happy Birthday" to P.M. from P.M.'s age that day to age eighteen, adding a candle to the cake for each year after singing for that year. Mother said that she did not know how that might have affected P.M.

When asked whether P.M. stopped singing at age twelve and said "Mom, I don't want to do this anymore," Mother said, "She may have." Mother also had

temporary orders entered in family law cases are not appealable, they are potentially subject to mandamus review to determine whether the trial court abused its discretion).

P.M. sign a Mother's Day card for Mother since Mother's Day was the following week and told P.M. that some of the gifts in the room were for P.M. to give back to her for Mother's Day. Mother gave P.M. several T-shirts that she had made with P.M. and Mother's photo on them.

P.M.'s foster mother Katie, a registered nurse who was dual-licensed to foster and adopt, testified that she had been P.M.'s foster mother since April 2013 and that her family wanted to adopt P.M. Katie explained the extensive training and background checks required to become a foster parent and said that her family included her husband, who is retired, a biological child, an adopted child, and foster children. Katie said that P.M. was a part of the family and was happy and healthy and that she and her husband could provide for P.M.'s physical and emotional needs in a safe and stable environment. When Katie and her husband bought a new house, P.M. and the rest of the children helped in making the decision of which house to buy, and P.M. selected her bedroom. Katie testified that when P.M. came to live with them, their sole purpose was to give P.M. "a safe, happy environment where she could be a child of her age, give her educational opportunities."

When P.M. came to stay with Katie's family, they enrolled P.M. in her fourth kindergarten that year, taught her healthy eating habits,[42] and started

---

[42]Katie stated that P.M. told her that when she lived with Mother they ate out most meals. Mother denied taking P.M. to eat fast food when P.M. lived with her and said that she only ate fast food once in a while.

taking her to church.  Katie gave P.M. other options for clothing because when she came into the home, some of P.M.'s T-shirts were too low cut and her shorts too short, and P.M. did not feel comfortable wearing them.[43]  P.M. told Katie that Mother would not let her wear her hair the way she wanted to—P.M.'s hair was very long when she came into care and difficult for P.M. to care for.  Katie let P.M. have a haircut.[44]

P.M. had lived with Katie's family for over a year, celebrated her seventh birthday with her foster family,[45] and completed her first-grade year before the trial.  P.M. was on the A-B honor roll at school.[46]  Katie stated that P.M.

---

[43]Mother denied dressing P.M. in clothing that was inappropriately short or low cut.

[44]Mother testified that when P.M. was removed a second time, she stressed to DFPS that she did not want P.M.'s hair to be cut.  Mother stated that P.M. loved for her to fix P.M.'s long hair in ringlets every morning.

[45]Diane Greene, the current CPS caseworker, testified that she had not given P.M. any of Mother's gifts and that she put them in Tackett's office to be given to P.M. at some point, but Katie said that P.M. had received gifts from Mother at the beginning of her stay, for her birthday, and on other occasions. Katie testified that P.M. put Mother's gifts in her "memory box," a large box that Katie and her husband bought for P.M. to keep mementos from her family.  Katie said that as time went by, P.M. threw away some of the stuff, including T-shirts that had photos of her and Mother on them.

[46]Mother called as witnesses the elementary school counselor and P.M.'s kindergarten teacher from the school that P.M. had attended for around sixty days on the monitored return.  The counselor stated that she did not receive any referrals about P.M., had very little contact with the child, and did not know anything about P.M.'s living environment.  The teacher recalled that P.M. had done well academically, did not recall any discipline problems, and said that Mother had seemed supportive of P.M.  She did not recall why P.M. was absent for fifteen days out of the sixty that she attended the school.  P.M.'s student

60

occasionally mentioned Mother or her grandmother but "the only thing she talks about a lot is missing a dog that she had." Katie said that P.M. did not tell her that she missed Mother or wanted to see her. P.M. had asked Katie when she would be adopted.

Cruson said that based on her interactions with P.M., P.M. seemed to be bonded with her foster family. Cruson said that P.M.'s foster parents seemed very supportive of P.M. and that P.M. had told her that she was tired of going from house to house, wanted to stay with her current foster parents, and wanted to be adopted by her foster family.

Hoenig testified that she had put in over 430 hours in the case, attending all of the hearings, observing visits between Mother and P.M., visiting foster homes, speaking with professionals about P.M., and reviewing documentation regarding P.M. Hoenig had observed P.M. in her current foster home, said that she was a "very peaceful, happy little girl," and said that there were no concerns about that home's ability to meet P.M.'s physical and emotional needs. Hoenig said that she thought what CASA wanted for P.M. and what P.M. wanted for herself was the same: to be adopted by her foster family.

---

records reflect that P.M. was out in December 2012 on December 5, 6, and 7 for a funeral and from December 12 to December 13 for illness; she was tardy on December 17. P.M. was out for a doctor's visit on January 9 and for illness on January 10, 22, and 24. P.M. was out for doctor's visits on February 5 and 11 and for illness on February 1, 6, and 22; and she was out on March 1 for illness and was tardy on March 4.

Tackett stated that when DFPS is looking at a home—either a parent's or a foster parent's—for stability, it looks at whether the child's basic needs for food, clothing, and shelter can be met; whether the child's emotional needs can be met; whether the child's educational, medical, and social needs can be met; and whether the child will be provided with structure, stability, consistency, love, nurturing, "all the things that a child deserves to have when being raised by a parent." DFPS evaluates safety by looking for any physical hazards as well as the parents' choices and behaviors that might put the child at emotional or physical risk.

Tackett stated that while Mother was able to meet P.M.'s physical needs by seeking medical care when P.M. was sick, keeping the home clean and the child clean, clothed, and fed, and P.M.'s attending school during the monitored return, some of Mother's parenting choices were not good. Tackett said that during the most recent hearing regarding visitation, when Mother testified, "it was I, I, I, I, and it was all about what she needed, what she wanted, what was best for [Mother], and not what was best for the child or what the child needed."

Tackett also stated that DFPS had not asked Mother to participate in any services since March 2014 because there were no additional resources in the community in which Mother could participate that she had not already utilized. Tackett stated that DFPS had not been in agreement that allowing Mother to have visits with P.M. since April 2013 was in P.M.'s best interest. DFPS's current plan was for P.M. to be adopted by her foster parents if Mother's rights were

terminated.  Tackett stated that this was in P.M.'s best interest because the foster family could provide P.M. with security, love, stability, and safety and because Mother had not been able to show that she could provide these things to P.M. or to make appropriate choices on P.M.'s behalf.  To the contrary, in Tackett's opinion, Mother had continued to show that she thought her needs were more important than P.M.'s.

Dr. Talmage said that in her April 2014 psychological evaluation, P.M. was diagnosed with "[a]djustment disorder with anxiety, upbringing away from parents, high expressed emotion level within family, child neglect."  Dr. Talmage said that her first recommendation was to resolve the custody matter because P.M. had been in limbo since she was five years old and had had multiple caretakers.  P.M.'s 2014 evaluation reflected that P.M. called Katie and her foster father "Mama and Daddy," and began referring to them as such immediately after she was placed in their home.  It also noted that since P.M.'s placement in that home, she had "experienced a great deal of healing from her early childhood trauma of physical abuse and domestic violence.  She is happy in the home and functioning well within the family," but was still experiencing a moderate-to-high level of hidden anxiety due in part to the uncertainty of her family status.

Sherry said that it would not be best for P.M. to go home with Mother because Mother had not been able to take care of P.M. before the case and the child was in a good home now, was happy, and had a chance "to go to school and to become something."  When asked whether she believed that if P.M.

remained in her current placement she would have a much better life, Sherry replied that she did, even if it meant Sherry did not get to see her again. During cross-examination, Sherry agreed that she had not seen P.M. in a year and did not know how she was currently doing in the foster home. Sherry asserted that the fact that she did not like Mother or get along with her was not the reason she did not want Mother to have P.M. back. Sherry said she did not know anything about Mother right now but that it would be easier for P.M. to stay where she is.

Mother said that she had learned how to be a better parent, how to communicate better with P.M., and how to have healthier relationships through completing the service plan. Mother said that her memory was improving and had improved since February 2011 but that she had not been employed since April 2013 because the stress from a regular job was too much for her.[47] She performed volunteer work instead. Mother acknowledged that taking care of a child could be extremely stressful but said that she would manage due to the skills she had learned. Mother said that she had finally gotten her closure and that she did not want a relationship with Father going forward. Mother said that

----

[47]Mother was rarely employed, which had concerned DFPS throughout the case. When P.M. was born, Sherry agreed to buy all of P.M.'s diapers and formula because Mother was unemployed and had no income. Sherry said that Mother made money for her trips to Atlanta by having garage sales. On one or two occasions, Mother had to ask Sherry to wire money to her so that she and P.M. could get back to Texas. Sherry stated, "[Mother] had no money. They had nothing to eat and no gas."

64

she was no longer in love with Father and that she had finished processing things in the last year, and had learned from her past.

Mother testified that when P.M. lived with her, she took her to school and picked her up afterwards or walked with her to wait for the bus and met her at the bus after school. They went to the park and would go shopping together. P.M. loved to paint, so they would paint together and sing, dance, and read. Mother said that she had not changed P.M.'s room and that it was a room for a princess, with a canopy bed, dolls, and tiaras. No one else lived with Mother, and she still had P.M.'s dog. Mother stated that although she had moved her trailer, P.M.'s elementary school would be the same one she had attended before. Mother had health insurance and said that P.M. would have health insurance and that she would be able to take care of P.M.'s financial needs.

Mother described her stress management techniques, said that she attended two to four AA/Al-Anon meetings per week, and was able to describe working various steps in AA's 12-step program.[48] When her counsel asked her how she was able to remember that, Mother replied, "Because you're asking me questions to talk about my life on a nondefensive mode, whereas when they [DFPS] are addressing me, they're very attackive [sic] and defense—you know, my defense mechanism comes up because I've had to deal with them for two-and-a-half years."

---

[48]Mother said that she had been attending AA for around two-and-a-half years, was working on all twelve steps, and had had a sponsor for almost a year.

65

Mother said that Roland was supportive and that she was in a dating relationship with him but said that her focus and priority was P.M. Mother said that her life felt unsettled because she had been fighting DFPS for two-and-a-half years and "[t]here's so much injustice in it." Mother said that her plan to deal with P.M.'s stress was

> To be able to comfort her, to listen, to understand and express and help her with everything that's taken place. I'm the most qualified to do that because I've been exactly where she's at. So together I can help her to understand to some degree as best as possible everything that's taken place.

Mother said that P.M. would need counseling and "most assuredly needs that now every week as opposed to the foster mom addressing that it's every other week." With regard to other needs besides counseling, Mother said,

> Well, she needs her mommy. She needs me to tuck her in at bed, at nighttime, to have the time to play with her hair, to spend that time with her. And I have that time. I'm able with what I make from my disability to be able to give her that time that I don't believe she's actually getting right now.

Mother said that she would be able to meet the demands of being a parent despite her PTSD.

Mother testified that she had previously taken P.M. to counseling at Denton County Friends of the Family and would take P.M. back there consistently if P.M. were returned to her. During cross-examination, Mother admitted that she had only taken P.M. for counseling twice from May 17, 2011 to September 6, 2011, and had no-showed on four occasions and cancelled the

other appointments. Mother agreed that the only time she had consistently taken P.M. for counseling was when CPS had ordered it to happen.

Livings testified that Mother had consistently met her counseling goals throughout the process—Mother addressed sobriety, healthy relationships, communication skills, healing from trauma, and parenting skills in their sessions—and she stated that she believed that Mother was able to make good parenting decisions. Livings acknowledged that she had never gone to Mother's home and observed her parenting.

From January 2014 onward, Mother attended counseling at Denton County Friends of the Family with Ryan and said that they discussed PTSD. Mother had not been ordered or referred to counseling but was engaging in it voluntarily and consistently. Ryan said that she had seen Mother grow personally since January, developing her determination, openness to education, communication skills, and that Mother was focused on taking care of herself and becoming a better parent by healing and becoming protective of her daughter.

Based on the evidence, the factfinder could have reasonably formed a firm belief or conviction that P.M.'s desires and her emotional and physical needs now and in the future could be best satisfied by her foster family. It could also have formed that same firm belief or conviction with regard to whether Mother still presented an emotional and physical danger to the child and whether, despite having completed all of her CPS services, Mother still lacked parental abilities and stability, particularly in comparison to the foster family. P.M.'s

67

counseling records demonstrated, from P.M.'s role-playing, that there was some evidence that the parent-child relationship between Mother and P.M. was not a proper one, and the jury could have reasonably formed a firm belief or conviction that Mother lacked any excuse for her acts and failures to act over the course of the case. Therefore, viewed in the light most favorable to the finding and judgment, we conclude that the evidence is legally sufficient to support the best interest finding. Further, giving due deference to the jury's findings and credibility determinations, the jury could have reasonably formed the same firm conviction or belief that termination would be in P.M.'s best interest despite the evidence produced by Mother and her counselors to the contrary. Therefore, we conclude that the evidence is also factually sufficient to support the best-interest finding, and we overrule Mother's eighth issue.

## B. Mother's Remaining Issues

### 1. Due Process, Possession, and Access

In her second issue, Mother claims that DFPS's March 2013 removal of P.M. was illegal because there were no exigent circumstances and DFPS did not give her proper notice, secure the trial court's permission before removing the child, or conduct the removal pursuant to the family code. In her first issue, Mother argues that the trial court wrongfully denied her visitation and access to P.M. by not returning P.M. to her when the case was remanded and by not enforcing supervised visitation from the temporary orders in place before the monitored return order.

The trial court's November 2, 2012 order modifying temporary orders, which set out increased visitation followed by the monitored return, specifically stated that DFPS "shall continue to serve as Temporary Managing Conservator of the child, shall monitor the placement to ensure that the child is in a safe environment, *and shall, if circumstances indicate that the home is no longer a safe environment, remove the child from the home*." [Emphasis added.] *Compare* Tex. Fam. Code Ann. § 264.107(e)(1) (West 2014) (stating that in making placement decisions, DFPS shall, except when making an emergency placement that does not allow time for required consultations, consult with the child's caseworker, attorney ad litem, and guardian ad litem, and with any court-appointed volunteer advocate for the child, and use clinical protocols to match the child to the most appropriate placement resource), *with id.* §§ 262.101–.105, .109 (West 2014) (setting out procedures that DFPS must follow *before* it becomes child's managing conservator, including written notice to parent or child's conservator when agency takes possession of child "under this chapter"), *and id.* § 263.403(c) (West 2014) (stating that if a child placed with a parent on a monitored return must be moved from that home by DFPS before the suit is dismissed or trial on the merits commences, the trial court shall, at the time of the move, schedule a new date for dismissal). As P.M.'s temporary managing conservator, DFPS did not have to obtain a court order prior to removing P.M. from Mother in March 2013, and the trial court's November 2, 2012 order authorized the removal. And because a temporary order is valid and enforceable

69

only until properly superseded, and the trial court's November 2, 2012 order superseded the December 1, 2011 order, Mother cannot rely on the December order to support her visitation argument. *See id.* § 262.204(a) (West 2014).

Further, on March 25, 2013, after having previously granted Mother a continuance of the bench trial, the parties agreed to carry Mother's motion to return the child and set aside emergency removal with the trial, Mother's counsel stated that she was ready to proceed on the issue, and the case ultimately resulted in the trial court's termination of Mother's parental rights. Mother then received a second hearing on the same issue in February 2014, and the trial court denied her motion after DFPS informed the trial court that it merely made a placement change because it remained the child's managing conservator when P.M. was placed with Mother on the monitored return. Under the circumstances here, we cannot say that Mother's due-process rights were violated when Mother had the opportunity to be heard on the removal issue twice. *See generally Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976) (stating that the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner).[49] We overrule Mother's second issue.

---

[49]"Due process" expresses the requirement of "fundamental fairness" within a given situation and requires weighing the private interests at stake, the government's interests, and the risk that the procedures used will lead to an erroneous deprivation and then assessing the net weight of these interests against the presumption that the procedure applied did not violate due process. *J.F.C.*, 96 S.W.3d at 303 (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24–

Finally, when a trial court is asked to determine issues related to possession of and access to a child, its primary consideration must be the child's best interest under the *Holley* factors set out above in our best-interest analysis. *See* Tex. Fam. Code Ann. § 153.002 (West 2014); *see also id.* § 153.001(a)(1) (West 2014) (stating that Texas's public policy is to assure that children will have frequent and continuing contact with parents "who have shown the ability to act in the best interest of the child"). Trial courts have broad discretion to determine what is in the child's best interest and to determine frequency and duration of visitation rights. *In re E.N.C.*, No. 03-07-00099-CV, 2009 WL 638188, at *15 (Tex. App.—Austin Mar. 13, 2009, no pet.) (mem. op.). An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

---

25, 27, 101 S. Ct. 2153, 2158–59 (1981)). In *J.F.C.*, the court concluded that in a termination-of-parental-rights case, the first factor—that of parent and child—reflects a desire for an accurate and just decision that does not unduly prolong a final decision about the child's permanent home, and the second factor is characterized by the child's best interest as the State's primary concern and the State's secondary concern that proceedings not unduly prolong a final decision about the child's future. *Id.* at 304–05. The third factor here is DFPS's removal of P.M. from Mother upon discovering that Mother had allowed P.M. to stay overnight with strangers without DFPS's prior approval as the child's managing conservator. The balance of these factors, along with Mother's two hearings on the issue, demonstrates that she was not deprived of due process.

71

Although complete denial of parental access should be reserved for situations rising nearly to the level that would call for a termination of parental rights, *see Philipp v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00418-CV, 2012 WL 1149291, at *8 (Tex. App.—Austin Apr. 4, 2012, no pet.) (mem. op.), here, the trial court denied access and visitation when the termination trial was a few weeks away and after hearing conflicting evidence that seeing Mother before the trial would not be in P.M.'s best interest. *See id.* at *9 (concluding that the trial court did not abuse its discretion by denying mother any access to child when evidence supported implied finding that any contact with mother would not be in child's best interest); *In re C.W.*, 39 S.W.3d 280, 286 n.2 (Tex. App.—Texarkana 2001, no pet.) ("[A] severe restriction or limitation, even one that amounts to a denial of access, is permissible if it is in the best interest of the child."); *cf. E.N.C.*, 2009 WL 638188, at *18 (reversing trial court's order to the extent that it denied parent all access in light of little evidence that parent had been a perpetrator of harm and remanding case for trial court to determine what amount and type of access were appropriate under the circumstances).[50] Therefore, we conclude that the trial court did not abuse its discretion, and we overrule Mother's first issue.

---

[50]Although Mother filed her motions in January and February 2014, and the trial court did not hold a hearing on temporary orders until April 29, 2014, nothing in the record shows that Mother tried to obtain an earlier hearing date and, as pointed out above, Mother did not file a petition for writ of mandamus in this court to vacate the trial court's order denying visitation before the June 2, 2014 trial or to force the trial court to rule on her motions sooner.

## 2. P.M.'s Attorney ad Litem's Performance

In her third issue, Mother contends that P.M.'s legal objectives were not properly represented on remand by her ad litem attorney. However, a party may not complain of errors that affect only the rights of others. *In re T.N.*, 142 S.W.3d 522, 524 (Tex. App.—Fort Worth 2004, no pet.) (holding that mother had no standing to raise claims on appeal about the performance of children's ad litem attorney on the children's behalf). Because Mother has no standing to complain about P.M.'s ad litem attorney, we overrule her third issue. *See id.*

## 3. Recusal and Judicial Bias

In her fourth issue, Mother argues that the denial of her motion to recuse the trial judge was improper, and in her fifth issue, she complains that there was evidence of judicial bias against her to such a degree during trial that it amounted to harmful error.

In her verified motion to recuse the trial judge, Mother stated that the trial judge's impartiality might reasonably be questioned in the new trial and attached a copy of our opinion as an exhibit to her motion. Mother further stated that the trial judge had a personal bias or prejudice against her "in that he stated on the record while delivering his ruling that he believed she had lied so much that she did not know what the truth was." Mother attached an excerpt of the reporter's record from the previous trial and a copy of her DFPS acknowledgment-of-substance-use form in which she admitted to using methamphetamine in October 2011, as exhibits to the motion to show that while the trial judge had stated that

73

she had lied about using methamphetamine, Mother had in fact not denied its use.

The Honorable Jeff Walker, then-presiding judge for the 8th Judicial Administrative Region, heard Mother's recusal motion on December 17, 2013. Mother testified that although the trial judge had said at the end of her trial that she had lied about drug use, she had not lied, had admitted using drugs when CPS first removed P.M., and had never lied about her drug use to CPS. Mother stated that she believed the trial judge "was very partial to the DA's office" and could not provide her with a fair trial. During cross-examination, Mother said she could not recall if the trial judge had made any rulings in her favor during the bench trial but agreed that he had admitted evidence in her favor. Mother testified that she believed the trial judge did not listen to or consider all of the evidence before terminating her parental rights, but she agreed that there were disagreements at trial between the parties with regard to whether Mother had told the truth on certain matters. Judge Walker noted that the trial judge had heard everything in the previous trial and "obviously, did not believe [Mother]. But there's nothing in the record that says that was based upon extrajudicial bias or extrajudicial impartiality." Judge Walker denied the motion.

An order denying a motion to recuse may be reviewed only for an abuse of discretion on appeal from the final judgment. Tex. R. Civ. P. 18a(j)(1)(A). A judge must recuse in any proceeding in which his or her impartiality might reasonably be questioned or in which he or she has a personal bias or prejudice

74

concerning the subject matter or a party. Tex. R. Civ. P. 18b(b)(1)–(2). When a request for recusal is based on the trial judge's alleged bias, the bias must be extrajudicial and not based on in-court rulings. *Franklin v. City of Fort Worth*, No. 02-12-00453-CV, 2014 WL 3696092, at *4 n.3 (Tex. App.—Fort Worth July 24, 2014, no pet.) (mem. op.). The standard for recusal on an assertion of bias or impartiality is whether a reasonable person in the community would believe that the judge's recusal is required. *Garrett v. Macha*, No. 02-09-00443-CV, 2010 WL 3432826, at *2 & n.11 (Tex. App.—Fort Worth Aug. 31, 2010, no pet.) (mem. op.) (citing *Kirby v. Chapman*, 917 S.W.2d 902, 909 (Tex. App.—Fort Worth 1996, no writ)).

A judge's impartiality might reasonably be questioned "only if it appears that he or she harbors an aversion, hostility[,] or disposition of a kind that a fair-minded person could not set aside when judging the dispute." *Liteky v. United States*, 510 U.S. 540, 558, 114 S. Ct. 1147, 1158 (1994) (Kennedy, J., concurring). Generally, however, recusal is not required when based solely on judicial rulings, remarks, or actions; in and of themselves, these cannot show reliance upon an extrajudicial source and can only in the rarest circumstances evidence the degree of favoritism or antagonism required when no extrajudicial source is involved. *Id.* at 555–56, 114 S. Ct. at 1157 ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."). Based on the evidence presented by Mother at the recusal hearing,

we cannot say that Judge Walker abused his discretion by denying Mother's motion, and we overrule Mother's fourth issue.

Although we have stated that an appellant cannot show bias based on in-court rulings, *see Franklin*, 2014 WL 3696092, at *4 n.3, Mother contends that the trial judge showed bias against her in his jury trial rulings by sustaining DFPS's objection "calls for a legal conclusion" on nine different occasions and preventing her expert, Dr. Talmage, from reviewing P.M.'s psychological evaluation after the child was removed from Mother while allowing DFPS's expert to review Mother's drug and alcohol evaluation on the same basis.

With regard to the trial court's nine rulings pointed out by Mother, most appear to have been properly sustained and appear to relate to the trial court's ruling on the parties' motions in limine with regard to any mention of the prior termination trial. However, because Mother did not make any offers of proof of what she proposed to show with the evidence excluded by the objections, *cf.* Tex. R. App. P. 33.1; Tex. R. Evid. 103(a)(2), and because Mother did not ensure that the court reporter recorded the bench conferences during which the objections were discussed, she cannot show us how these rulings constituted bias against her. *See In re D.J.M.*, 114 S.W.3d 637, 639 (Tex. App.—Fort Worth 2003, pet. denied) (stating that a party may waive the making of a record by failing to object to its lack during the hearing, and when a party is present before the court, due diligence must be exercised in seeking a record); *see also In re D.C.*, No. 05-12-01574-CV, 2014 WL 1887611, at *8 (Tex. App.—Dallas May 9,

76

2014, no pet.) (mem. op.). *Compare Stubbs v. Stubbs*, 685 S.W.2d 643, 645 (Tex. 1985) (construing family code section 105.003's predecessor as requiring all *oral testimony* to be recorded), *with Valle v. State*, 109 S.W.3d 500, 508–09 (Tex. Crim. App. 2003) (stating that to preserve error for appeal, criminal appellant was required to object if bench conferences were not being recorded).[51] Because the rulings themselves show no bias or such deep-seated favoritism or antagonism that making a fair judgment would be impossible, we overrule this portion of Mother's fifth issue. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (citing *Liteky*, 510 U.S. at 555, 114 S. Ct. at 1157).

With regard to Mother's other instance of alleged bias, the record reflects that Mother objected that Culberson had not performed the evaluation on Mother and so was not the proper person to testify regarding the actual document and diagnosis and that the trial court overruled Mother's objection because DFPS had asked Culberson to "explain the manner in which *a* drug and alcohol evaluation is conducted." Mother's drug and alcohol evaluation had already been admitted

---

[51]Mother did not file a formal bill of exception to show us what those bench conferences contained, and she does not explain how the trial court showed bias by ruling on these objections when most, if not all, were properly sustained. *See* Tex. R. App. P. 33.2 (stating that to complain on appeal about a matter that would not otherwise appear in the record, a party must file a formal bill of exception); *see also* Tex. R. App. P. 38.1(i); *Heimendinger v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-97-00079-CV, 1999 WL 274061, at *2 (Tex. App.—Austin May 6, 1999, pet. denied) (not designated for publication) (stating that even without a record of the bench conferences, parent's counsel could have reviewed the record to see what testimonial evidence was presented after an objection followed by a bench discussion and presented arguments that the testimony was improperly admitted over objection).

into evidence as a business record, and Culberson's direct testimony was limited to generalities pertaining to chemical dependency evaluations; she did not address Mother's specific evaluation other than to note the recommendation for supportive outpatient treatment and then to explain generally what supportive outpatient treatment involved. During cross-examination, Mother's counsel asked specific questions about Mother's program participation, and Culberson testified about that from personal knowledge. The record does not reflect that Culberson testified about the contents of Mother's evaluation other than that First Step had recommended supportive outpatient treatment.

The next day, during Dr. Talmage's testimony, the trial court admitted P.M.'s psychological evaluations from 2011, 2013, and 2014. When the trial court allowed DFPS's counsel to take Dr. Talmage on voir dire, Dr. Talmage revealed that although she had conducted the 2011 evaluation herself, the 2013 and 2014 evaluations were performed by postdoctoral interns under Dr. Talmage's supervision. At the conclusion of this voir dire, Mother had the following dialogue with Dr. Talmage:

> Q. Did you say you brought with you the person who conducted the most current evaluation?
>
> A. That is correct.
>
> Q. And she would be available to testify.
>
> A. Well, normally my students do not testify, but if the court required it—

Q. So that she could explain these results with firsthand knowledge. She would be able to do that.

A. Yes, that's correct.

After Dr. Talmage's testimony about the 2011 evaluation, P.M.'s ad litem attorney stated, "I think we have a quick point to address with your Honor if we don't have an agreement." Mother's counsel stated, "I would like to call the assistant that's here." DFPS's counsel responded, "And, Judge, may we approach on that issue?" The bench conference was not recorded, and Mother did not object to the court reporter's failure to record it. *See D.J.M.*, 114 S.W.3d at 639.

After the bench conference, Dr. Talmage was recalled, Mother asked Dr. Talmage questions about the 2014 evaluation, and DFPS's counsel cross-examined Dr. Talmage. Mother did not make an offer of proof with regard to what the assistant would have testified and did not file a formal bill of exception with regard to what was raised and ruled upon during the bench conference. *Cf.* Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2). And Mother states in her appellate brief that she did not disclose the assistant as a witness, contrary to the trial court's order at the May 14, 2014 hearing on DFPS's motion to compel. *See* Tex. R. Civ. P. 193.6(a), 194.2(f), 195.6. Therefore, based on our entire review of the record, including Mother's specifically highlighted instances set out above, we conclude that there was no showing of bias against Mother by the trial judge, and we overrule Mother's fifth issue.

79

### 4. ADA Violation

In her ninth issue, Mother complains that DFPS violated her rights under the Americans with Disabilities Act (ADA) by failing to accommodate her disability. However, she also acknowledges that this court has previously held that in a termination-of-parental-rights case, an ADA complaint is an affirmative defense that must be pleaded and proven and for which findings must be secured to preserve error for appeal. *See In re J.I.*, No. 02-04-00299-CV, 2005 WL 1047891, at *14 (Tex. App.—Fort Worth May 5, 2005, no pet.) (mem. op.); *see also In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.); *In re C.M.*, 996 S.W.2d 269, 270 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

Mother did not plead this affirmative defense, the record does not contain any requests for inclusion of an ADA question in the jury charge, and Mother did not make any objections to the jury charge that was submitted to the jury. Therefore, although Mother brought forth some evidence at trial regarding DFPS's list of available accommodations under the ADA,[52] she has failed to

---

[52]Mother did not show how the accommodations on the list applied to her situation. *See B.L.M.*, 114 S.W.3d at 649. That is, Mother states that her attorney asked for communications to go through counsel because of Mother's memory loss and argues that all requirements should have been given to her in writing, but the list of accommodations itself contains such items as "reasonable service modifications" (without definition), identifying needs for modified services, making reasonable efforts to coordinate with public and private agencies that provide treatment or support services and to obtain suggestions from service providers, increasing the frequency with which a service is provided or extending the length of time that the service is provided, providing reminders for

preserve this issue for our review because she did not plead, prove, or obtain a finding on the affirmative defense.  We overrule Mother's ninth issue.

## IV.  Conclusion

Having overruled all of Mother's issues, we affirm the trial court's judgment.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  December 31, 2014

---

appointments or services on a more frequent and intensive basis, relocating a service to an accessible facility, and providing program information in large print, audio tape, or Braille, among others that do not necessarily translate into the accommodations requested by Mother.

Although Fox testified that she had seen no outward signs of PTSD or memory loss, to accommodate Mother, Fox talked with Mother's counselor on several occasions about what she could do to provide Mother with additional help.  Fox also said that CPS tried to accommodate Mother with the "stress" factor by offering a more private place for filial therapy and then also accommodating her with the filial therapy by having it in her counselor's building. After Mother's counsel allowed CPS to have open communication with Mother, Fox tried to build a relationship with Mother to better assess what Mother needed.  She also worked with Mother to obtain community resources, such as the food bank and getting a subsidized-aid cell phone.